TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING








NO. 03-09-00397-CV






Hanson Aggregates West, Inc., Appellant


v.


Edwin R. Ford, Regina Ford, Clarence Cain, Connie Cain, James L. Kersey, Mary Kersey,
Brett Papell and Lynn Papell, Appellees






FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT

NO. C2007-0056A, HONORABLE DIB WALDRIP, JUDGE PRESIDING





O P I N I O N


 We withdraw our opinion and judgment dated January 6, 2011, and substitute the
following in their place. We overrule appellees' motion for rehearing.

 In dispute in this appeal are the substantive and procedural standards that govern
claims for permanent injunctive relief against a private nuisance. A group of homeowners filed suit
alleging that a nearby rock quarry had created a nuisance and sought both money damages and a
permanent injunction limiting quarry operations. A jury failed to find either that the quarry owner
had intentionally created a nuisance, that the owner had negligently created a nuisance, or that the
owner's conduct was "abnormal and out of place in its surroundings such as to create a nuisance."
Based on the jury's verdict, the district court rendered judgment that the homeowners take nothing
on their money-damage claims. However, the district court also issued a permanent injunction based
on the court's own determinations that the quarry operations "can and do create a nuisance" and
"in balance of the equities a permanent injunction should issue." We are called upon to determine
whether the permanent injunction was an abuse of discretion in light of the jury's verdict and
the evidence at trial. We conclude that it was, and will render judgment vacating the injunction.


BACKGROUND

 Appellant Hanson Aggregates West, Inc., owns and operates a rock quarry near
the City of Garden Ridge. Although this quarry has been in operation in some form for decades,
over time both the quarry and Garden Ridge-area residential neighborhoods have expanded
and grown closer toward one another. Appellees are four married couples who own homes in the
quarry's general vicinity. Three of the couples--Edwin and Regina Ford, Clarence and Connie Cain,
and Brett and Lynn Papell--live in a subdivision called Trophy Oaks, which is adjacent to
Hanson's land, in houses located between approximately 1,000 to 2,000 feet away from the quarry.
The fourth couple, James and Mary Kersey, live about a mile away from both Trophy Oaks
and the quarry.

 Contending that explosive blasting operations at Hanson's quarry were creating
vibrations, noise, smoke, and dust that were damaging their homes and diminishing their health
and quality of life, thereby constituting a nuisance, appellees sued Hanson seeking a permanent
injunction to limit the blasting, as well as actual damages and punitive damages. The case was tried
to a jury. Approximately two weeks of testimony was presented.

 Prior to submission, appellees requested a jury question that inquired whether
Hanson had, by a preponderance of the evidence, "created a 'nuisance.'" "Nuisance," in turn, was
defined as "a condition that substantially interferes with the use and enjoyment of land by causing
unreasonable discomfort and annoyance to persons of ordinary sensibilities." This definition of
"nuisance" tracks language in Texas Supreme Court decisions. See Schneider Nat'l Carriers, Inc.
v. Bates, 147 S.W.3d 264, 269 (Tex. 2004) (citing Holubec v. Brandenberger, 111 S.W.3d 32,
37 (Tex. 2003)). Hanson objected to appellees' proposed "nuisance" question. The district court
ultimately submitted three alternative broad-form questions that required the jury to find both (1) the
existence of a "nuisance" (which was defined the same as in appellees' requested question) and
(2) one of three forms of culpability in regard to the "nuisance":

QUESTION NO. 1

 Did Hanson intentionally create a nuisance as to any of the following?

. . . .

QUESTION NO. 2

 Did Hanson negligently create a nuisance as to any of the following?

. . . .

QUESTION NO. 3

 Was Hanson's conduct abnormal and out of place in its surroundings such as
to create a nuisance as to any of the following?



These questions tracked the elements of what Texas courts have described as "actionable nuisance."
See, e.g., City of Tyler v. Likes, 962 S.W.2d 489, 503-04 (Tex. 1997) ("Courts have broken
actionable nuisance into three classifications: negligent invasion of another's interests; intentional
invasion of another's interests; or other conduct, culpable because abnormal and out of place in
its surroundings, that invades another's interests." (citing Bible Baptist Church v. City of Cleburne,
848 S.W.2d 826, 829 (Tex. App.--Waco 1993, writ denied))). The jury was instructed to answer
each of Questions 1, 2, and 3 separately as to each of the eight appellees, with either a "Yes" to
signify an affirmative finding by a preponderance of the evidence, or otherwise a "No."

 In all three questions, the jury answered "No" as to each appellee. Following the
jury's verdict, appellees urged the district court that the verdict, while perhaps foreclosing a
judgment awarding them money damages, did not limit the court's power "in equity" to issue a
permanent injunction to restrain any "nuisance" that the court found to exist. The district court
ultimately rendered a final judgment that appellees take nothing on their claims for monetary relief.
However, the court further adjudged "that the Quarry operations, specifically by blasting, can and
do create a nuisance" and "that in balance of the equities a permanent injunction should issue." The
district court issued a permanent injunction limiting the strength and location of quarry blasting
operations. Hanson appeals. (1)


ANALYSIS

 In a single issue on appeal, Hanson argues that the district court abused its discretion
in issuing the permanent injunction. We review a trial court's issuance of injunctive relief for an
abuse of discretion. Operation Rescue v. Planned Parenthood, 975 S.W.2d 546, 560 (Tex. 1998).
The general test for abuse of discretion is whether the court acted without reference to any
guiding rules and principles. Cire v. Cummings, 134 S.W.3d 835, 838-39 (Tex. 2004). A trial court
is also said to "clearly abuse its discretion" if it fails to interpret or apply the law correctly. See In re
Texas Dep't of Family & Protective Servs., 210 S.W.3d 609, 612 (Tex. 2006).

 Hanson urges that the district court misapplied the law by granting a permanent
injunction in the absence of either jury findings or conclusive evidence establishing an underlying
cause of action for nuisance. (2) While acknowledging that a permanent injunction is an equitable
remedy whose issuance is ultimately left to the trial court's discretion, Hanson emphasizes the
predicate requirement that "[n]o final relief, including a permanent injunction, can be granted in
a contested case without a determination of legal liability." See Valenzuela v. Aquino, 853 S.W.2d
512, 514 n.2 (Tex. 1993). Consequently, as Hanson observes, a trial court lacks discretion to issue
a permanent injunction unless supported by at least one valid underlying cause of action that is
established either by conclusive evidence or fact findings. See id. at 513-14. This requirement
is illustrated by the Texas Supreme Court's decision in Valenzuela. In that case, a doctor who
performed abortions sued individuals who had been picketing his house, seeking damages and
injunctive relief based on causes of action for negligent infliction of emotional distress and invasion
of privacy. At trial, the doctor had obtained jury findings on only his negligent-infliction theory, and
the trial court had rendered judgment awarding damages and a permanent injunction prohibiting
picketing within 400 feet of the doctor's home. The Texas Supreme Court held that the judgment,
including the permanent injunction, could not be sustained based on a negligent-infliction
cause of action because no such tort was recognized in Texas. See id. at 513. Nor, the supreme court
reasoned, could the judgment be supported by the invasion-of-privacy theory where the doctor "did
not request that either of the[] elements [of invasion of privacy] be submitted to the jury, and the
evidence did not establish either element beyond dispute." Id.

 Where facts material to the underlying cause of action's existence are in dispute,
Hanson adds, a litigant is entitled to have a jury determine them, as the Texas Constitution
guarantees the right to jury trial of factual disputes in both legal and equitable actions. See
Tex. Const. art. V, § 10; State v. Credit Bureau of Laredo, Inc., 530 S.W.2d 288, 292-93
(Tex. 1975); Casa El Sol Acapulco, S.A. v. Fontenot, 919 S.W.2d 709, 715-16 (Tex. App.--Houston
[14th Dist.] 1996, writ dism'd). (3) The jury's "findings on issues of fact are binding." Shields v. State,
27 S.W.3d 267, 272 (Tex. App.--Austin 2000, no pet.). Assuming the jury finds those facts, "[t]he
determination whether to grant an injunction based on ultimate issues of fact found by the jury is for
the trial court, exercising chancery powers." Id.

 Hanson contends that the evidence did not conclusively establish an underlying
cause of action for nuisance and that the district court thus properly submitted the ultimate
issues of disputed fact to the jury. Because the jury failed to find the facts that would establish a
nuisance cause of action, Hanson adds, the district court lacked any discretion to issue the
permanent injunction. See Valenzuela, 853 S.W.2d at 513-14. Hanson further observes that the
district court did not purport to disregard any of the jury's findings on the basis that they were
not supported by legally sufficient evidence (i.e., hold that the evidence conclusively established
an actionable nuisance that the jury failed to find), see Tex. R. Civ. P. 301, (4)
 but instead
indicated  in the final judgment that it was relying on its own "finding" of a nuisance. (5) That
"finding" was in itself error, Hanson urges, because the fact-finding power in this case belonged
exclusively to the jury.

 Emphasizing "the extraordinary dissimilarity between the facts of Valenzuela
and those of the present case," appellees suggest that the respective roles of jury and judge are
different in suits seeking to permanently enjoin an alleged nuisance. Appellees cite no authority for
that proposition, however, and the Texas Supreme Court has indicated that the same principles
control. In addressing the respective roles of judge and jury in a nuisance case, the supreme court
has explained that "a litigant has the right to a trial by jury in an equitable action," the jury makes
findings on "ultimate issues of fact" that are "binding," and the trial court--"exercising chancery
powers"--then determines "whether to grant an injunction based upon the ultimate issues of fact
found by the jury." State v. Texas Pet Foods, Inc., 591 S.W.2d 800, 803 (Tex. 1979).

 More recently, in an extensive analysis of the distinctions between temporary and
permanent nuisances and how the difference should be determined, the supreme court rejected the
potential criterium of remediability by injunctive relief with the following reasoning delineating the
respective roles of judge and jury in regard to equitable-relief claims for nuisance:

Categorizing a nuisance as temporary or permanent is . . . a question for the jury. But
abatement is a discretionary decision for the judge after the case has been tried and
the jury discharged. One is only partly dependent on the other: while judges cannot
permanently abate a nuisance until jurors decide there is one, a trial judge may
decide to abate a nuisance whether it is temporary or permanent, and may choose not
to abate either even if that is the only remedy requested.

Schneider, 147 S.W.3d at 286-87 (emphasis added and footnotes omitted). Significantly, in support
of its statement that "judges cannot permanently abate a nuisance until jurors decide there is one,"
the court cited Valenzuela for the proposition that a "permanent injunction [was] improper as one
cause of action was invalid in Texas and [the] other was not submitted to jury." See id. at 286 n.115.

 Finally, we also observe that the Dallas Court of Appeals, in a suit alleging restrictive-covenant violations and nuisance, dissolved a permanent injunction restraining the location
and speed at which their defendants drove vehicles on their own property because, among other
reasons, no jury question had been submitted regarding the defendants' operation of vehicles. Webb
v. Glenbrook Owners Ass'n, 298 S.W.3d 374, 391-92 (Tex. App.--Dallas 2009, no pet.).

 Appellees refer us to no authorities indicating that the respective roles of jury
and judge in regard to permanent injunctions are fundamentally different in nuisance cases than
they are in other cases. Especially in light of the supreme court's reasoning in Texas Pet Foods and
Schneider, we cannot conclude that they are. (6)

 Appellees further attempt to distinguish this case from the general rule of Valenzuela
based on a contention that the district court never submitted to the jury the proper factual predicate
for a permanent injunction. Appellees acknowledge that "[a] finding that a nuisance is intentionally
or negligently created, or abnormal and out of place for its surroundings," as submitted in the
jury charge, "is generally necessary to recover damages in a private nuisance suit." See City of
Texarkana v. Taylor, 490 S.W.2d 191, 194 (Tex. Civ. App.--Texarkana 1972, writ ref'd n.r.e.). But,
appellees insist, "[s]uch a finding . . . is not necessary to support injunctive relief." Instead,
appellees reason, one can obtain a permanent injunction based solely on a finding of a
"nuisance"--i.e., "a condition that substantially interferes with the use and enjoyment of land by
causing unreasonable discomfort and annoyance to persons of ordinary sensibilities"--regardless
whether the nuisance is an "actionable nuisance" for which damages can be awarded. Consequently,
while the district court submitted the broader issue of "actionable nuisance" to the jury, it did
not, appellees urge, submit the question of "nuisance" alone that controls their right to a
permanent injunction.

 Based on that premise, appellees maintain that the jury's failure to find an "actionable
nuisance" was immaterial to their claim for injunctive relief. Appellees also emphasize that they
requested a jury question inquiring whether a "nuisance" alone existed and that the district court,
at Hanson's urging, refused it. The effect of the district court's refusal to submit their requested
question on "nuisance," appellees urge, was to "reserve this question for itself in its chancery
powers," and they insist that nothing in the above authorities proscribes such a procedure under
these unique circumstances. In the alternative, if it was improper for the district court to make its
"nuisance" finding in lieu of the jury, appellees argue that Hanson waived that complaint through
"invited error" by persuading the district court not to submit their "nuisance" question to the jury. We need go no further than to reject appellees' premise that Texas law recognizes
a right to permanent injunctive relief against "nuisance" apart from the theories of "actionable
nuisance" that were submitted to the jury. Some confusion regarding this area of the law is
understandable, as the case law addressing "nuisances" has historically tended toward a conceptual
incoherence that prompted Dean Prosser, in his seminal article on the subject, to term it "a sort of
legal garbage can." See William L. Prosser, "Nuisance Without Fault," 20 Tex. L. Rev. 399, 410
(1942); see also Taylor, 490 S.W.2d at 193 (noting "the obscure and confused state of the law" and
observing that "it is very difficult, perhaps impossible, to reconcile much that the courts have written
on the law of private nuisance"). But as Prosser explained, and as Texas courts have since come to
recognize, the availability of a remedy for "nuisance" is grounded in tort principles. "Nuisance," in
the sense that appellees are using the term (a condition that substantially interferes with the use and
enjoyment of land by causing unreasonable discomfort and annoyance to persons of ordinary
sensibilities), refers to a type of damage or invasion of another's interests that can potentially be
actionable in tort. See Likes, 962 S.W.2d at 504 (quoting Prosser, 20 Tex. L. Rev. at 416); Taylor,
490 S.W.2d at 193. However, the type of invasion that characterizes "nuisance" is not, in itself,
a legal wrong that gives rise to a right to relief. Similar to many other types of invasions or
infringements, the invasion characterizing "nuisance" becomes tortious and wrongful only when
caused by intentional or negligent conduct, or conduct that is abnormal and out of place in its
surroundings (essentially a form of strict-liability nuisance). See Likes, 962 S.W.2d at 504 ("As in
the case of any other kind of damage, it may be inflicted by conduct which is intended to cause harm,
by that which is merely negligent, or by that which involves an unusual hazard or risk, in line with
the principle of Rylands v. Fletcher [ (7)]." (quoting Prosser, 20 Tex. L. Rev. at 416)); accord Hicks
v. Humble Oil & Ref. Co., 970 S.W.2d 90, 96 (Tex. App.--Houston [14th Dist.] 1998, pet. denied);
Bily v. Omni Equities, Inc., 731 S.W.2d 606, 611-12 (Tex. App.--Houston [14th Dist.] 1987,
writ ref'd n.r.e.) (citing Restatement (Second) of Torts § 822 (1977)); Taylor, 490 S.W.2d at 193-94 (citing Taylor v. City of Cincinnati, 55 N.E.2d 724 (Ohio 1944); Rose v. Standard Oil Co. of
New York, Inc., 185 A. 251 (R.I. 1936)). This is the import of the term "actionable nuisance" in
Texas law--one of the three categories of nuisances that gives rise to a cause of action in tort. See
Likes, 962 S.W.2d at 504; see also Black's Law Dictionary 1171 (9th ed. 2009) (defining "actionable
nuisance" as when condition or act that could be termed a "nuisance" falls within class of torts).
And, without a valid cause of action for nuisance (i.e., actionable nuisance), appellees were entitled
neither to damages nor to a permanent injunction. See Valenzuela, 853 S.W.2d at 513-14.

 In essence, appellees advocate for a theory of absolute-liability nuisance. We find
no support for such a theory in Texas law as a basis for any form of judicial relief. The sole
authorities appellees cite in support of it are Hot Rod Hill Motor Park v. Triolo, 276 S.W.3d 565
(Tex. App.--Waco 2008, no pet.), and McAfee MX v. Foster, No. 02-07-00080-CV, 2008 Tex. App.
LEXIS 968 (Tex. App.--Fort Worth Feb. 7, 2008, pet. denied) (mem. op.). Both opinions reflect
that a jury found a "nuisance"--although there is no elaboration regarding the form of the
charge--and that the trial court issued an injunction. Appellees extrapolate from these opinions that
no jury finding of intentional, negligent, or abnormal and out-of-place conduct is required to support
an injunction. See Hot Rod, 276 S.W.3d at 567; McAfee, 2008 Tex. App. LEXIS 968, at *1-2. To
the contrary, the opinions are silent as to whether, under the charge as submitted, the jury's
"nuisance" finding incorporated the findings required to establish actionable nuisance. Moreover,
even if appellees' characterizations of the jury findings in the two cases were correct, the absence
of a finding of intent, negligence, or abnormal conduct was not raised as an issue on appeal.
Consequently, neither case provides support for appellees' argument that such finding is not
necessary to obtain injunctive relief.

 In light of the foregoing, we hold that in order for the district court to have
discretion to issue the permanent injunction, appellees were required to establish actionable
nuisance--not merely "nuisance"--either through conclusive evidence or jury findings. The jury
found that appellees had failed to establish any theory of actionable nuisance by a preponderance
of the evidence, and those findings were "binding" on the district court, see Texas Pet Foods, Inc.,
591 S.W.2d at 803, unless the evidence conclusively established actionable nuisance, see Valenzuela,
853 S.W.2d at 513. Appellees have suggested that the district court's "finding" of "nuisance"
should be construed as a legal determination (not merely a fact finding) that the evidence
conclusively established actionable nuisance (not merely "nuisance"), see Tex. R. Civ. P. 301,
and they urge that this ruling was correct. To the extent that the district court's judgment could be
susceptible to this interpretation, we would hold that the evidence falls short of conclusively
establishing actionable nuisance.

 To conclusively establish a vital fact, the evidence must be such that reasonable
people could not disagree that the fact exists. See City of Keller v. Wilson, 168 S.W.3d 802, 814-17
(Tex. 2005). To conclusively establish actionable nuisance, then, the evidence must be such that
reasonable people could not disagree that Hanson (1) intentionally created a nuisance ("a condition
that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort
and annoyance to persons of ordinary sensibilities") as to one or more appellees; (2) did so
negligently; or (3) did so through conduct that was "abnormal and out of place in its surroundings."
See Likes, 962 S.W.2d at 503-04. The evidence left room for reasonable disagreement as to both the
extent of any interference with appellees' use and enjoyment of their property and Hanson's
culpability in regard to such an interference. 

 The jury heard evidence that the rock quarry has been in existence since the 1930s.
Hanson's blasting has occurred no more than once a day, generally between 11 a.m. and 2 p.m.,
and never on nights or weekends. There was evidence that, although not directly subject to federal
or state regulations, Hanson has taken efforts to ensure that blasting at the quarry was consistent with
established federal guidelines.

 The jury heard evidence that vibrations under 0.75 inches per second peak particle
velocity ("PPV") satisfy the federal guidelines established to determine safe blast vibration
intensities for single-residence houses. (8) According to the measurements provided by Vibra-Tech,
an independent company hired to measure Hanson's blasts, the average PPV was close to 0.1, and
the highest PPV was 0.59. Appellees obtained their own independent testing that indicated a higher
PPV, but their highest reading was 0.705, which was still below the 0.75 inches per second
threshold. The jury also heard evidence that only one of Hanson's blasts, measured at 134.5
decibels, exceeded the federal threshold for air overpressure of 134 decibels. Such overpressure
reading was characterized as being "unusual," (9) and the average air overpressure of the blasting was
stated to be 110 decibels.

 Appellees provided evidence of physical damage to their homes, consisting mostly
of cracking on floors or walls. However, Hanson's expert witness who examined the damage to
appellees' homes testified that all such damage was due to various combinations of construction
defects, thermal expansion and contraction, moisture exposure, and normal concrete shrinkage. He
further testified that such damage was not different from that observed in houses where there were
no quarry operations. (10)

 There was also evidence regarding Hanson's taking action to reduce the impact on
the residents from Hanson's blasting. A commission was formed by the residents to address quarry
issues. The commission's meetings were attended by both Hanson's representatives and concerned
residents. The readings from the blasting's monitoring were addressed at those meetings, and there
was evidence that Hanson acted in response to resident input, including using electronic blasting
caps to decrease the blasts' frequency, purchasing a profiler to determine weak spots for blasting,
and building a berm of dirt between the quarry and the residential subdivisions. Hanson also allowed
the quarry commission to select a company to independently monitor the blasting and, when Vibra-Tech was selected, agreed to pay for such monitoring.

 Finally, Bob Gunnarson, the chair of the quarry commission and a resident of the
subdivisions, testified that he did not consider the quarry to be a nuisance and that he considered the
nearby train to be a greater irritation.

 In sum, there is legally sufficient evidence that Hanson's quarry operations did not
result in an actionable nuisance to appellees. A jury could reasonably have found that Hanson did
not act intentionally or negligently to cause any "nuisance" to appellees, and that Hanson's conduct
was not abnormal and out of place in its surroundings. Given the jury's finding of no actionable
nuisance by Hanson and appellees' failure to prove an actionable nuisance by Hanson as a matter
of law, the district court lacked discretion to issue the permanent injunction. See Valenzuela,
853 S.W.2d at 513-14.


CONCLUSION

 We reverse the portion of the district court's judgment issuing a permanent injunction
against Hanson, vacate the injunction, and render judgment that appellees take nothing on their
equitable claims against Hanson. (11)



 __________________________________________

 Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Henson

Reversed and Rendered on Motion for Rehearing

Filed: February 9, 2011


 
1. Appellees, as well as a co-defendant of Hanson below--Austin Powder Company,
the blasting contractor at the quarry--also perfected appeals but subsequently dismissed them.
Austin Powder is no longer a party to this proceeding.
2. As appellees observe, Hanson does not complain that the district court abused its discretion
with regard to the scope of the injunction itself or its balancing of the equities, only that the court
had no discretion to issue a permanent injunction in the first place.
3. In Fontenot, the Fourteenth Court of Appeals summarized the historical basis for this right
to jury trial in equitable actions:


There is no common-law right to a jury trial in equity. However, two provisions
of the constitution insure the right to a jury trial in Texas. The first is contained in
the Texas Bill of Rights. See Tex. Const. art. I, § 15. This provision guarantees "the
right to a jury in all actions where that right existed at the time the Constitution was
adopted." Because the English chancery were judges of both fact and law at the time
our constitution was enacted, this provision does not alter the common law tradition
eschewing juries in equity actions.


Because of Texans' familiarity with Spanish law and procedure, they adopted a
second constitutional provision insuring the right to a jury trial in all causes. This
provision is found in the Judiciary Article. See Tex. Const. art. V, § 10. Thus, in
Texas, the "traditional distinctions between actions at law and suits in equity have
never carried the procedural significance accorded to them in other states of the
Union." The law in Texas is that the right to a jury trial extends to disputed issues
of fact in equitable as well as legal proceedings.

Casa El Sol Acapulco, S.A. v. Fontenot, 919 S.W.2d 709, 715-16 (Tex. App.--Houston [14th Dist.]
1996, writ dism'd) (citations and footnotes omitted).
4. See also City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W.
Calvert, "No Evidence" & "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63
(1960)) (holding that evidence is legally insufficient if evidence establishes conclusively the opposite
of the vital fact).

5. Hanson also emphasizes that in a pre-judgment letter to the parties, the district court
indicated that "it does not conclude that a nuisance in this case was established as a matter of law,"
but instead "finds, in equity, that the quarrying operations, specifically by blasting, can and do create
a nuisance of a recurring nature irrespective of the absence of an actionable remedy at law."
Although such pre-judgment letters do not control the standard or scope of our appellate review,
see Cherokee Water Co. v. Gregg County Appraisal Dist., 801 S.W.2d 872, 878 (Tex. 1990);
Mondragon v. Austin, 954 S.W.2d 191, 193 (Tex. App.--Austin 1997, pet. denied), we nonetheless
acknowledge that the district court's statements are consistent with its subsequent judgment.
6. Texas Pet Foods did involve a subtle distinction in the application of these principles,
however. Although the jury failed to find a violation of a Clean Air Act prohibition against
"causing or contributing or threatening to cause or contribute to the emission of odors or other
air contaminants into the atmosphere . . . in such concentration and of such duration as are or may
tend to be injurious to or adversely affect human health or welfare, or as to interfere with the normal
use and enjoyment of animal life, vegetation or property," the trial court issued a permanent
injunction that, in part, barred the same conduct. State v. Texas Pet Foods, Inc., 591 S.W.2d 800,
804-05 (Tex. 1979). This part of the injunction was not an abuse of discretion, the Texas Supreme
Court reasoned, because it had been predicated on jury findings of hundreds of other specific
violations. See id. at 802, 804-05. Consequently, this holding is consistent with the general rule
from Valenzuela that a permanent injunction must be predicated on jury findings or conclusive
evidence establishing at least one valid cause of action.
7. 3 Law Rep. House of Lords 330 (1868).
8. Catherine Aimone-Martin, Hanson's expert on vibration measurements from blasting,
testified that PPV was the best measure to correlate to home damage. Aimone-Martin also testified
that she had "100% confidence" that there could be no damage to a single-family residence of the
construction type of appellees' homes when the PPV was below 0.75 inches per second.
9. Aimone-Martin testified that even at 134.5 decibels there was no basis to believe that
Hanson's blasting caused damage to appellees' homes. While appellees testified regarding their
own experiencing of the blasts, Aimone-Martin testified that her conclusions were based on
scientific testing and that appellees' perceptions did not alter her conclusions.
10. Appellees contend that "nuisance" was established as a matter of law based on testimony
of Bruce Northup, a representative of Austin Powder Company, one of the defendants, that he would
consider some of the damage to appellees' houses to be a "nuisance." However, Northup clarified
that such conclusion was predicated on the assumption that the damage was, in fact, caused by the
blast, a conclusion with which he disagreed. Northup further testified that the blasting level required
to cause such damage would also have caused external windows to break, and there was no such
breakage.
11. While this appeal was pending, appellees filed a motion seeking contempt sanctions
against Hanson for a violation of the permanent injunction that allegedly occurred before
the district court's judgment was superseded. Having determined that the district court abused
its discretion in issuing the permanent injunction, we dismiss appellees' motion as moot. 
See Manufacturers Hanover Trust Co. v. Kingston Investors Corp., 819 S.W.2d 607, 612
(Tex. App.--Houston [1st Dist.] 1991, no writ); Flowers v. Flowers, 589 S.W.2d 746, 747-48
(Tex. Civ. App.--Dallas 1979, no writ).